PER CURIAM.
Otha Steele and Harold E. Steele (“the Steeles”)[1] appeal from a judgment of the Jackson Circuit Court granting Hugh O’Neal, Lonnie Hill, and Anita Hill a private easement by prescription over an unpaved roadway (“the roadway”) that crosses the Steeles’ property and denying the Steeles the monetary damages they had requested.
The Steeles own a parcel of property in Jackson County, and the roadway crosses a portion of that property. O’Neal owns a parcel of property that abuts the Steeles’ property; his only means of vehicular access to this property is by means of the roadway. The Hills own a parcel of property that adjoins O’Neal’s property; like O’Neal, the Hills can only access their property by the roadway.
On November 6, 2002, O’Neal filed a complaint alleging that Otha Steele and her husband, James Steele, had interfered with his use of the roadway. O’Neal requested a temporary restraining order (“TRO”), a preliminary injunction, and a permanent injunction enjoining Otha and James from interfering with his use of the roadway. In his complaint, O’Neal presented alternate theories to support his request for injunctive relief: (1) that the roadway was a public road and (2) that he had acquired a private easement by prescription by virtue of his and his predecessors in title’s use of the roadway for more than 20 years. On November 6, 2002, the trial court entered the TRO and set the matter for a hearing on November 18, 2002. After the hearing, the trial court entered a preliminary injunction enjoining Otha and James, or anyone acting on their behalf, from interfering with O’Neal’s use of the roadway and allowed O’Neal to erect a gate across the roadway. O’Neal was required to provide Otha and James with a key to the gate. The trial court also allowed O’Neal to use the roadway until January 1, 2003, to remove timber harvested on his property; however, O’Neal was responsible for repairing the roadway to restore it to the condition it was in before the timber was removed. On January 22, 2003, Lonnie Hill moved to intervene in the action, asserting that he was an adjoining landowner and that he had an interest in the use of the roadway.
Otha and James answered O’Neal’s complaint, denying all of its material allegations. On May 5, 2003, Otha and James filed a counterclaim against O’Neal and various fictitiously named defendants, claiming that O’Neal and others had trespassed on their property, had damaged timber, had caused damage to the land and roadways by flooding and erosion, and had diminished the value of the Steeles’ property. Otha and James requested $1 million in compensatory and punitive damages. O’Neal answered the counterclaim, denying all of its material allegations.
Approximately one year later, on May 18, 2004, Otha and James filed a third-party complaint against Lonnie Hill’s wife, Anita, and Mark Henley[2] alleging that O’Neal, the Hills, and Henley had trespassed on their property; had damaged their land, fences, timber, roadway, and bridge; and had removed a gate that they had erected on the property. Otha and James again requested compensatory and *562 punitive damages. They also filed an amended counterclaim on May 18, 2004, alleging that O’Neal, the Hills, and Henley had violated the trial court’s November 18, 2002, order by continuing to trespass on their property and had caused further damage to the property. On the same date, Otha filed a suggestion of death for James.
On January 7, 2005, Harold E. Steele, James and Otha’s son, filed a motion to intervene, alleging that he was a co-owner of the property across which ran the roadway. The trial court granted Harold’s motion on January 11, 2005. Harold answered O’Neal’s complaint, denying all of its material allegations. Harold also adopted the claims asserted by Otha in her counterclaim and third-party complaint.
On January 15, 2005, O’Neal and the Hills filed an amended complaint, claiming that the Steeles had violated the trial court’s preliminary injunction by interfering with O’Neal’s right to use the roadway to access his property; the Hills asserted that the Steeles had also interfered with their use of the roadway. O’Neal and the Hills requested that the trial court hold the Steeles in contempt for their violation of the preliminary injunction. O’Neal and the Hills also filed a motion seeking to broaden the scope of the preliminary injunction to explicitly apply to the Hills and Harold. The trial court, over the Steeles’ objection, granted that motion on February 4, 2005.
The trial of the matter took place on February 28, 2006. The trial court heard ore tenus evidence from numerous witnesses regarding the character and use of the roadway. The evidence adduced at trial tended to show the following.
The roadway, which is unpaved, has been in existence since at least 1911. Witnesses testified that in 1968, a public bridge on the main road over Big Coon Creek washed out. While that bridge was impassable, six or seven families used the roadway and its bridge to access their properties. A school bus and a mail-delivery vehicle also traveled on the roadway while the bridge was out. Larry Glass, who does not own any property accessible by the roadway, testified that in the 1970s, he often used the roadway to take his sons fishing.
J.D. Phillips; who formerly owned the property owned by O’Neal and the Hills, was unable to attend the trial because of ill health, and his deposition testimony was submitted into evidence. Phillips said that in 1972, he purchased the land that included the parcels now owned by the Hills and O’Neal. Phillips testified that he used the roadway crossing the Steeles’ property for at least 12 years to access his property. He said that he also used the roadway to haul timber from his property to the county road that intersects with the roadway. Phillips also said that he made improvements to the roadway.
Harold Steele said that his parents moved to their property in 1984, but it had been in the family for decades. Also in 1984, the Hills purchased their parcel of property from Phillips. Phillips took Lonnie Hill to the property by way of the roadway, crossing the Steeles’ property. Phillips told Hill that the roadway was the only way to access his property. Since 1984, the Hills have continuously used the roadway to access their property. They eventually built a cabin on the property and used the roadway to bring building materials to the site. In 1984, Lonnie Hill said, he installed a gate at the roadway’s entrance from County Road 53. He testified that, at that time, he gave James Steele a lock and key to the gate. Harold testified that from 1970 until Hill put up the gate, there had been a cable across the roadway’s entrance.
*563 Larry Cheatwood and Geraldine Cheat-wood purchased a parcel of property from Phillips, and O’Neal purchased that parcel from the Cheatwoods in 1993. O’Neal testified that he used the roadway to access his property for hunting, harvesting timber, and “rig racing.” Hill provided O’Neal with a key to the gate at the. roadway’s entrance. O’Neal said that the utility company also had a key to the gate so that it could reach the Hills’ property to read the electric meter at the Hills’ cabin each month.
In 2002, O’Neal hired Thompson & Har-wood (“Thompson”) to harvest the timber on his property. To facilitate the hauling of timber, Thompson cleared the roadway, added rock to part of the roadway, and “smoothed it out” to make it passable for its logging trucks. No one at Thompson had any conversations with Otha, James, or Harold before making the improvements to the roadway. Todd Langston, who worked for Thompson at the time the improvements were made, testified that the only way to access O’Neal’s property was by the roadway.
When the timber harvesting began, the Hills and O’Neal began having trouble with Otha and James concerning the use of the roadway. James “reconfigured” the lock on the gate so that Thompson workers could not unlock it to access the roadway. O’Neal testified that he and Otha and James had agreed to allow the gate to stay open so that the timber harvesters could come and go. O’Neal also said that Thompson agreed to repair any damage that might occur on the roadway’s bridge and to grade the roadway. Despite the agreement, Otha and James continued to attempt to deny O’Neal, the Hills, and Thompson’s employees access to the roadway. Tacks and nails were placed on the roadway. Langston described discussions with Otha and James as “extremely difficult” and said that Otha and James would confront the workers and tell them they could not use the roadway. Eventually, O’Neal said, there were “some shots fired” from the county road, and Thompson had its employees stop work at the O’Neal property until the situation could be resolved.
Even after the preliminary injunction was issued in November 2002, Otha, James, and Harold continued in their efforts to prevent O’Neal and the Hills from using the roadway. Lonnie Hill testified to an incident that occurred in 2005. He explained that he was attempting to use the roadway to reach his property when Otha and a man he later learned was John Hallman blocked his way. Hallman told Hill the roadway was private and that he “best not go up it.” The confrontation resulted in a physical altercation between Hill and Hallman.
More than four years after the trial, on July 27, 2010, the trial court entered its judgment.[3] In the judgment, the trial judge stated that she had “physically viewed the subject property.” The court determined that O’Neal and the Hills had established a private easement by prescription over the roadway, determined that O’Neal and the Hills had a right to use the roadway to access their properties, and permanently enjoined the Steeles and their successors in title from interfering with O’Neal and the Hills’ use of the roadway. The trial court denied all other claims by the parties. The Steeles filed a motion for new trial, which the trial court denied. The Steeles subsequently appealed to the Alabama Supreme Court. Our supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
*564 On appeal, the Steeles argue that the trial court’s judgment should be reversed and the cause remanded based on the failure to join Jackson County as a party to the action because, the Steeles argue, Jackson County was an indispensable party to the action, which, they assert, involved the question whether the roadway was a public road.
Generally, a county is an indispensable party to an action seeking to determine whether a road is public or private. Boles v. Autery, 554 So.2d 959, 962 (Ala.1989). This, however, was an action to determine whether O’Neal and the Hills could use the roadway to access their otherwise landlocked properties. After Otha and James began preventing the adjacent property owners from using the roadway, O’Neal filed his complaint and asserted that he was entitled to use the roadway for one of two reasons; specifically, he stated that he “believe[d] that the county may have maintained at least a portion of the road in years past, thus making it a public road,” and, alternatively, that he had acquired a private easement by prescription in the roadway because he and his predecessors in title had used the roadway openly for more than 20 years. In an amended complaint, the Hills joined in asserting these allegations. The judgment entered in the case established that O’Neal, the Hills and their respective successors had a private easement by prescription over the roadway at issue. It contained no finding as to whether the roadway is a public road; thus, the judgment is not binding on the county.
In Melton v. Harbor Pointe, LLC, 57 So.3d 695, 700 (Ala.2010), our supreme court discussed the application of Rule 19(a), Ala. R. Civ. P., which pertains to the joinder of indispensable parties when join-der is feasible:
“This Court stated in J.R. McClenney & Son, Inc. v. Reimer, 435 So.2d 50, 52 (Ala.1983), that ““[indispensable parties’ are persons who not only have an interest in the controversy but an interest of such a nature that a final decree cannot be made without either affecting that interest or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience.” ’ (Quoting 1 Champ Lyons, Alabama Practice, Rules of Civil Procedure, at 389 (1973).) The Court further stated in Reimer:
“ ‘There is no prescribed formula to be mechanically applied in every case to determine whether a party is an indispensable party or merely a proper or necessary one. This is a question to be decided in the context of the particular case. Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). The issue is one to be decided by applying equitable principles and, under the circumstances of this case, it would be inequitable to vacate this judgment on motion of the defendant, which has so blatantly ignored the rules under which its mortgagee bank could have so easily been made a party.’
“435 So.2d at 52 (emphasis added).”
Our supreme court also has stated:
“Rule 19, Ala. R. Civ. P., provides for joinder of persons needed for just adjudication. Its purposes include the promotion of judicial efficiency and the final determination of litigation by including all parties directly interested in the controversy. Where the parties before the court adequately represent the absent parties’ interests and the absent parties could easily intervene should they fear inadequate representation, no reason exists why the trial court could not grant *565 meaningful relief to the parties before the court. Also, joinder of absent parties is not absolutely necessary where determination of the controversy will not result in a loss to the absent parties’ interest or where the action does not seek a judgment against them.”
Byrd Cos. v. Smith, 591 So.2d 844, 846 (Ala.1991) (citations omitted; emphasis added). See also Gatlin v. Joiner, 31 So.3d 126, 132 (Ala.Civ.App.2009); and Morgan Plan Co. v. Bruce, 266 Ala. 494, 497-98, 97 So.2d 805, 808 (1957).
Moreover, this court has held:
“The court, when determining parties under Rule 19, should place emphasis on the practical and pragmatic considerations of each case. Provident Tradesmen[s ] Bank & Trust v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); Lopez v. Martin Luther King, Jr. Hospital, 97 F.R.D. 24 (C.D.Cal.1983). A determination of whether an interest under Rule 19(a)(2) exists should be viewed from a practical standpoint and should turn on the particulars of the case. Lopez, supra.”
Felder v. State, 515 So.2d 17, 18 (Ala.Civ.App.1987) (emphasis added).
“A defendant’s delay and its self-serving purpose for raising the issue have also been held to be proper considerations in determining whether a judgment is proper in the absence of a particular party. J.R. McClenney & Son, Inc. v. Reimer, 435 So.2d 50, 52 (Ala.1983). See also, Geer Bros., Inc. v. Walker, 416 So.2d 1045, 1050 (Ala.Civ.App.1982).”
Byrd Cos., 591 So.2d at 846.
In discussing Rule 19(b), Ala. R. Civ. P., which applies when joinder is not feasible, one treatise has stated that, after a trial on the merits,
“the pragmatic considerations set forth in Ala. R. Civ. P. Rule 19(b) as to whether to abort the lawsuit ‘weigh heavily in favor of preserving the judgment of the trial court or modifying it to protect the interests of the absentee and against dismissal unless there had been real prejudice to those not before the court.’ 7 Wright, et al., Federal Practice and Procedure: Civil (2d ed.), Civil 2d § 1609.”
1 Champ Lyons, Jr., and Ally W. Howell, Alabama Rules of Civil Procedure Annotated at 566 (4th ed.2004). Another treatise has stated that, “[bjecause the doctrine of indispensability is equitable in character, the court will not dismiss for nonjoinder when special circumstances would make it inequitable to do so.” 7 Charles A. Wright et al., Federal Practice and Procedure § 1611 at 169 (3d ed.2001).
In a case involving the issue of whether the failure to join an allegedly “indispensable party” required reversal, the Supreme Court of North Dakota affirmed the judgment of the trial court, echoing the rationale expressed in the quote above from Lyons and Howell, Alabama Rules of Civil Procedure Annotated:
“ ‘The purpose of the compulsory joinder rule is to protect an absent party from prejudice, to protect parties from harassment by successive suits, and to protect the courts from being imposed upon by multiple litigation. Cudworth v. Cudworth, 312 N.W.2d 331, 333 (N.D.1981). Although the failure to join an indispensable party may be raised for the first time on appeal, “[o]nce the trial has been concluded, the pragmatic considerations in Rule 19 weigh heavily in favor of preserving the judgment of the trial court ... and against dismissal unless there has been real prejudice to those not before the court.” Cudworth v. Cudworth, supra, 312 *566 N.W.2d at 334. Dismissal of an action for nonjoinder of a party is an extreme remedy which should only be granted where a party is truly “indispensable.” Kouba v. Great Plains Pelleting, Inc., 372 N.W.2d 884, 887 (N.D.1985).’
“Erdmann v. Thomas, 446 N.W.2d 245, 249 (N.D.1989).”
In re Estate of Murphy, 554 N.W.2d 432, 438 (N.D.1996).
Courts have been struggling for decades with the issue of whether to reverse a judgment that does not affect the rights of a party that has been deemed “indispensable” after the entry of the judgment. In dissenting to the reversal of a judgment that confirmed the interest of the non-joined “indispensable” party, Judge Hutcheson of the United States Court of Appeals for the Fifth Circuit noted that “it seems to me a vain thing to reverse for the absence of parties a judgment whose rights it does not adversely affect.” Calcote v. Texas Pac. Coal & Oil Co., 157 F.2d 216, 224 (5th Cir.1946) (Hutcheson, J., dissenting).
In Lyons and Howell, Alabama Rules of Civil Procedure Annotated, it is noted that the reversal of the judgment in Davis v. Burnette, 341 So.2d 118 (Ala.1976), in which the trial court’s judgment appeared to be favorable to the interest of the absent party, “apparently required a second trial while an affirmance would end the matter and would perhaps have better served a purpose of compulsory joinder of preventing imposition on the courts. Accord, 7 Wright, et al., Federal Practice and Procedure: Civil (2d ed.), Civil 2d § 1609.” 1 Lyons and Howell, Alabama Rules of Civil Procedure Annotated at 566.
The record in this case indicates that the Steeles filed both a counterclaim and a third-party complaint in this action and did not join the county as a party. The record also indicates that the Steeles do not want anyone using the roadway across their property. Otha testified that she had never given O’Neal and the Hills permission to use the roadway. During cross-examination, she stated that it was her roadway. When the attorney questioning her replied that that was the question they were in court to determine, Otha said, “I know whose road it is.” After further questioning, Otha and the attorney representing O’Neal and the Hills had the following discussion:
“Q. [By the plaintiffs’ attorney]: So the road needs some work on it, doesn’t it?
“A.: No, it doesn’t need any work on it.
“Q.: The road doesn’t need any work on it?
“A.: No, sir. We’re not going to use it anymore. I need the field — my property more than I need the road.
“Q.: If Judge Holt says that Mr. O’Neal and Mr. Hill have the right to use that road, are you going to let them use the road?
“A.: No.
“Q.: No, you’re not?
“A.: No.
“Q.: You’re not going to do it?
“A.: No. I can’t. I can’t open my land up to the public—
“Q.: So—
“A.: —to the hunting community.
“Q.: So you’re not going to follow the Judge’s order?
“A.: I’ll have to appeal it.
“Q.: But if you appeal it and that Court says that they have a right to use the road, you—
“A.: Well, we’ll go somewhere else and appeal it.
*567 “Q.: You’re not going to let these gentlemen—
“A.: I have to have my land. And I can’t open it up — You’ve seen what they done already.
“Q.: Yes, ma’am, I have; the road looks good.
“A.: Yes. But my farm looks bad. And I need the farm, I don’t need the road.”
This matter has been in litigation since November 2002. The Steeles had ample opportunity to join the county as a party to this action, and they failed to do so. Further, the record clearly demonstrates that the Steeles do not want the roadway to be declared a public road. It appears that the Steeles may be raising the issue of the county’s joinder as a delaying tactic and doing so singly for the purpose of gaining a second opportunity to try their case. At this stage in the litigation, to reverse the judgment — at the Steeles’ request — on the ground that the county is an indispensable party in what is clearly a private dispute, this court would be giving the Steeles that second opportunity, i.e., a second bite at the apple.
O’Neal and the Hills merely wanted the Steeles to stop blocking their access to their properties via the roadway. The trial court granted them the relief requested without having to make a determination that the roadway was a public road; thus, the relief requested was obtained without having to include the county as a party. No prejudice to the county has been shown. The judgment imposes no duties or responsibilities on the county, and it does not foreclose a later action regarding whether the roadway is a public road.
Accordingly, we conclude that, for the equitable and pragmatic reasons allowed by Rule 19, Ala. R. Civ. P., the trial court did not err in refusing to add Jackson County to this action as an indispensable party.
The Steeles contend that the trial court erred in determining that O’Neal and the Hills had presented substantial evidence demonstrating that they had established a private easement by prescription. As mentioned, the trial court heard ore tenus evidence in this case; thus, our standard of review is as follows.
“Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)).
“ ‘ “The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). The rule applies to “disputed issues of fact,” whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala.1995). The ore tenus standard of review, succinctly stated, is as follows:
“ ‘ “[WJhere the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under *568 any reasonable aspect, it is supported by credible evidence.” ’
“Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). However, ‘that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.’ Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala.1994).”
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala.2010). “[T]he ore tenus presumption is further strengthened in a case involving a dispute over real property, where the trial judge views the land in question.” Hereford v. Gingo-Morgan Park, 551 So.2d 918, 920 (Ala.1989). “ ‘[W]here a trial judge takes a view of the subject property there must be a strong showing of error before reversal is proper.’ ” Miller v. Harris, 945 So.2d 1072, 1076 (Ala.Civ.App.2006) (quoting Bull v. Salsman, 435 So.2d 27, 30 (Ala.1983)).
In their brief to this court, the Steeles contend that the Hills and O’Neal failed to prove that they “possessed” the roadway to the exclusion of others or that their “claim of title” to the roadway was adverse, continuous, and uninterrupted for the 20 years before the action was filed. In Johnson v. Metro Land Co., 18 So.3d 962, 968 (Ala.Civ.App.2009), this court reiterated the well settled law regarding the establishment of a private easement by prescription:
“In Andrews v. Hatten, 794 So.2d 1184, 1186 (Ala.Civ.App.2001), this court indicated that, ‘[i]n order to establish [a private] easement by prescription, the claimant must use the property over which the easement is claimed, for a period of 20 years or more, in a manner adverse to the owner of the property, under a claim of right, and the use must be exclusive, continuous, and uninterrupted, with the actual or presumptive knowledge of the owner.’ ”
In Belcher v. Belcher, 284 Ala. 254, 257, 224 So.2d 613, 615 (1969), our supreme court affirmed a judgment holding that the owners of property adjacent to property traversed by the road at issue had a private easement by prescription in the road. Evidence in that case indicated that the property owners seeking the easement had used the road for more than 20 years to access their property. Belcher, 284 Ala. at 256, 224 So.2d at 614. As in this case, the road at issue in Belcher was the adjacent property owners’ only means of accessing their property by vehicle; they used the road to haul their belongings to and from their property, their children used the road to go to and from school, and their visitors used the road when they visited by car. 284 Ala. at 256-57, 224 So.2d at 614-15.
Likewise, in Fisher v. Higginbotham, 406 So.2d 888 (Ala.1981), our supreme court affirmed a judgment holding that a private easement by prescription had been established by owners of property adjoining another’s tract of property traversed by the road in question. Fisher, 406 So.2d at 888. The property owners seeking the easement, as well as their predecessors, had used the road for almost 50 years. Id. And again, as in this case, the road was the only means the property owners had to access their property. In affirming the judgment establishing the easement, our supreme court noted that the property owners seeking the easement had “produced evidence of similar use [as the use demonstrated in Belcher ] ... extending over several decades, and we cannot say that the decree of the trial court was plainly erroneous or manifestly unjust.” Id. at 889.
*569 Here, the undisputed evidence indicates that, since at least 1972, Phillips and his successors have used the roadway continuously to access the properties now owned by the Hills and O’Neal. Other evidence indicated that the roadway had been in use since at least 1911. There is no indication in the record that anyone ever asked Otha, James, or Harold for permission to use the roadway; thus, the Hills’ and O’Neal’s use of the roadway was adverse to the Steeles’ title. See Fisher, supra. The evidence also demonstrates that the Steeles had actual knowledge that others were using the roadway to access the property that lay beyond theirs.
In Belcher, our supreme court discussed the meaning of “exclusivity” in the context of obtaining an easement as follows:
“[I]n Tiffany Real Property, Third Edition, Vol. 4, § 1199, ‘Necessity of exclusive user,’ [was defined] as follows:
“ ‘It is sometimes said that, in order to acquire a right of user by prescription, the user during the prescriptive period must be exclusive, but this appears to be so in a very limited sense, if at all. It means, it has been said, no more than that the claimant’s right must rest upon its own foundations and not depend upon a like right in any other person; it is not necessary that he should have been the only one who used or was entitled to use it, so long as he used it under a claim of right independently of others. For instance, the user of another’s land for purposes of passage, if continued for the prescriptive period, may operate to create an easement of a right of way, although the owner of the land also passes upon the same line or allows others to pass thereon, nor is it material, in this regard, that an exactly similar easement of passage in favor of another is already existent, or is in course of establishment.’ ”
Belcher, 284 Ala. at 257, 224 So.2d at 615.
In this case, Harold testified that a cable had been placed across the entrance to the roadway in the 1970s. No evidence was presented to dispute that claim. Lonnie Hill erected a gate at the entrance to the roadway in 1984, and he provided gate keys only to James Steele and, when O’Neal purchased his property, to O’Neal and the utility company so that they could use the roadway to access the O’Neal property. The locked gate indicates that the Hills and O’Neal intended the use of the roadway to be exclusive to the property owners along the roadway and their guests, regardless of whether others used the roadway to reach hunting and fishing destinations. The trial court’s judgment in this case is supported by substantial evidence, and, as was the case in Belcher and Fisher, we cannot say that the trial court’s judgment in this case was plainly erroneous.
The Steeles also contend that the trial court erred in failing to award them monetary damages for trespass and for the actual damage they claim was done to their property. In its judgment, the trial court did not specifically address the Steeles’ claim for monetary damages. After finding that the Hills and O’Neal had established a private easement by prescription and setting forth their rights accordingly, the trial court denied all other relief or claims of the parties. It is well settled that, in the absence of specific findings of fact, an appellate court will presume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Baker v. Baker, 862 So.2d 659, 662 (Ala.Civ.App.2003); see also Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).
*570 The record indicates that witnesses disagreed about the condition of the roadway after Thompson’s employees worked on it. Harold testified that the roadway was not in as good a condition as it had been before the summer of 2002. He denied that the roadway had been restored and said that where previously he had been able to drive “down through there with my car,” he “wouldn’t put any kind of car down through there” at the time of the trial. He later testified that he could not drive his small car down the roadway because of ruts, and he “assume[d]” one could not drive a mid-sized car on the roadway because, he said, the car would drag.
Harold acknowledged that he had not maintained the roadway since litigation began in this case in 2002. When Harold was shown photographs of the roadway taken in the fall of 2004, after Thompson had graded it, he admitted that in the photographs the roadway appeared to be in better condition than it had been in 2002, “if the [photographs] were real.” However, he denied that the photographs accurately depicted the roadway at the time of trial.
Harold also testified that the timber-harvesting company or “whoever” graded the roadway had pushed “dirt and stuff’ into a fence that ran beside the roadway. He also said that trees had been knocked into the fence and that the fence was in shambles. He said that before the roadway was graded, the fence had been good. Harold also claimed that a bulldozer had demolished a shed next to his barn while work on the roadway was being done. He also testified that a ditch that had drained water from the roadway into a creek was stopped up and that water now backs up in a field that had once been cultivated. Harold said that previously he had rented the field but that the people who leased it had told him they could no longer grow beans there because there was now too much water in the field.
Wayne Summers, who said he was “maybe [a] real distant” relative of the Steeles, testified that, with Otha’s permission, he had walked on the roadway “a couple of times a week” for several years, both before and after 2002. Summers said that he did not know of anyone other than the Steeles who used the roadway and that he was unfamiliar with anyone else who would have a need to use the roadway.
On direct examination, Summers said that, at the time of the trial, the roadway was in a worse condition than it had been before 2002. Before 2002, he said, there were places where the roadway held water, but, he added, the roadway had a rock bottom and a car could be driven on it. He testified that, currently, when it rains “you can’t drive a four-wheel truck down through there, probably.” He also said a field next to the roadway could no longer be cultivated because it was muddy. However, on cross-examination, Summers testified that, since 2004, brush had been cleared off the roadway and that it was wider than it had been, but otherwise, he said, it looked the same.
On the other hand, witnesses testifying on behalf of the Hills and O’Neal testified that the roadway had been improved since the Hills and O’Neal had been using it. O’Neal testified to improvements he had made to the roadway. Additionally, Mark Henley, who Thompson had hired to repair the roadway when it had finished harvesting timber on O’Neal’s property, testified to improvements he had made to the roadway. Henley said that he did the road work in January 2004. He said that he could see where water had been rushing across the roadway, so he cleaned out the ditch that ran beside the roadway and put down gravel “to keep the water going *571 down the ditch.” Henley denied that he had knocked down any trees while working on the roadway. There was also no evidence presented indicating that Henley was responsible for damage to the Steeles’ fence and shed.
Todd Langston, who also worked for Thompson, said that when he first saw the roadway, it had standing water, brush on the side of the roadway was grown up and hanging over the roadway, and the roadway had rocks on it. Before timber harvesting began on O’Neal’s land, Langston said, Thompson improved the roadway so that logging trucks could use it. When the timber harvesting was completed, he said, Henley improved the roadway and left it in good condition. Langston testified that he wished that Thompson had had more time to do more work on the roadway, but, he said, the situation with Otha and James, described earlier, did not allow Thompson to finish improving the roadway in the manner it normally would have. There was no evidence presented indicating that Thompson had damaged the shed or the fence.
The evidence regarding the damage, if any, to the roadway was in dispute, as was evidence regarding whether work on the roadway had caused an influx of water onto the Steeles’ field. Harold testified that a ditch that had drained water from the roadway into a creek was stopped up, causing the water to back up; Henley testified that he had cleaned out the ditch and had repaired it so that water did not overflow the ditch. No evidence was presented as to who was responsible for the damage to the Steeles’ fence and shed. Moreover, we note that the trial court personally viewed the roadway at issue. Pursuant to the ore tenus standard of review applicable in this case, this court may not reweigh the evidence or sit in judgment of disputed evidence.
“ ‘When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.’ Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So.2d 911, 913 (Ala.Civ.App.1985). ‘[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.’ Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003) (citations omitted).”
Ex parte R.E.C., 899 So.2d 272, 279 (Ala. 2004).
Based upon the evidence in the record, we conclude that the trial court could have found that the Steeles had failed to prove that, to the extent any of their property, including the roadway, the field, the fence, and the shed, was damaged, the named defendants’ had caused that damage. The record supports the trial court’s judgment rejecting the Steeles’ claim for monetary damages.
The Steeles have not provided this court with any basis for reversal. For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMAS, J., dissents, with writing, which MOORE, J., joins.

. Harold Steele is the son of Otha Steele and James Steele. James Steele was a named defendant in the original complaint; he died during the pendency of the action.

. Henley was hired by the timber-harvesting company to repair the roadway after its timber-harvesting operations on O'Neal’s property ended.

. There is no explanation in the record for the lengthy delay in the entry of the judgment.